# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**KIA BASKERVILLE,**

                        *Plaintiff*,

            **v.**                                             **Civil Action No. 18-2522 (FYP)**

**CBS NEWS INC.,**

                        *Defendant*.

## MEMORANDUM OPINION

Plaintiff Kia Baskerville was employed by Defendant CBS News Inc. as Manager of Staff Development and Diversity Initiatives, until she was terminated in June 2018.  Baskerville alleges that CBS fired her because of her disability — a condition known as premenopausal dysphoric disorder ("PMDD") — and thus unlawfully discriminated against her in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2.1401.01 *et seq*.  She further alleges that CBS terminated her employment in retaliation for an extended leave of absence that she took for medical reasons, in violation of the D.C. Family Medical Leave Act ("DCFMLA"), D.C. Code § 32-507.  Before the Court is CBS's Motion for Summary Judgment, in which it argues that Baskerville does not have a disability under the DCHRA; that Baskerville was terminated for legitimate, non-discriminatory reasons; and that her retaliation claim is without merit.  *See* ECF No. 17 (Defendant's Motion for Summary Judgment).[1]  For the reasons that follow, the Court will grant Defendant's Motion for Summary Judgment.

---

[1]         Plaintiff filed an Opposition, *see* ECF No. 21, and Defendant filed a Reply, *see* ECF No. 27.

**BACKGROUND**

Between 1995 and 2016, Baskerville worked in a variety of positions in the Washington, D.C., bureau of CBS News.  *See* ECF No. 17-2 (Defendant's Statement of Undisputed Material Facts ("DSUMF")), ¶ 1; ECF No. 39-1 (Plaintiff's Undisputed Facts),[2] ¶ 1.  She performed well for the first 21 years of her employment.  *See* PSUMF, ¶¶ 4, 16–17, 22; Def. Reply at 8 ("Plaintiff was, by all accounts, a well-respected and successful news producer.").  In 2016, Baskerville transitioned to a new role as Manager of Staff Development and Diversity Initiatives, in which one of her primary responsibilities was managing CBS's internship program in Washington, D.C.  *See* PSUMF, ¶ 23; ECF No. 27-1 (Defendant's Response to Plaintiff's PSUMF ("Def. Resp.")) at 10–11.  In her new job, Baskerville was supervised by Kim Godwin, Executive Director for Diversity and Staff Development, who was based in New York.  *See* DSUMF, ¶ 4; PSUMF, ¶ 23.  The D.C. news bureau was managed by Bureau Chief Chris Isham and Deputy Bureau Chief Ward Sloane, who both observed Baskerville's job performance.  *See* DSUMF, ¶ 5; PSUMF, ¶¶ 5–6.

Baskerville struggled in her new role.  Soon after she started, her coworkers complained to Godwin that Baskerville "wasn't pulling her weight" and that "she was taking too long to meet deadlines."  *See* DSUMF, ¶ 6; PUF, ¶ 6.  In addition, Godwin learned that Baskerville drank alcohol at work events, took interns out for drinks, and conducted interviews with potential

---

[2]       In her Third Revised Statement of Material Facts in Dispute, Plaintiff has divided relevant facts into three sections:  (1) Plaintiff's Undisputed Facts, which repeat the facts from the DSUMF that Plaintiff does not dispute; (2) Plaintiff's Statement of Additional Undisputed Material Facts, which contains Plaintiff's own undisputed facts; and (3) Plaintiff's Statement of Material Facts in Dispute, which contains Plaintiff's responses to those material facts Defendant has claimed are undisputed but which Plaintiff does dispute.  *See generally* ECF No. 39-1.  Because Plaintiff starts re-numbering in each section, the Court must indicate from which section it is citing in each instance.  As a result, the Court will refer to Plaintiff's Undisputed Facts ("PUF"), Plaintiff's Statement of Undisputed Material Facts ("PSUMF"), and Plaintiff's Statement of Material Facts in Dispute ("PSMFD").  Additionally, because Plaintiff does not include paragraph numbers in her PSMFD, the Court will use page numbers to cite to facts in that section.

interns at bars.  *See* DSUMF, ¶¶ 7–8; PSMFD at 15 (admitting that Baskerville "went to bars

with interns," but that after Godwin instructed her not to do so, "it never happened again").  CBS

interns are college students, who are as young as 18 years old.  *See* PSUMF, ¶ 24; Def. Resp. at

11.  Both Isham and Sloane "were extremely disappointed in [Baskerville's] lack of

performance . . . and her desire to seemingly have others do what she should be doing."  *See*

DSUMF, ¶ 28; PSUMF, ¶ 36.  Sloane stated that Baskerville was "not recruiting interns; not

doing her job; not being accountable."  *See* DSUMF, ¶ 14; PSUMF, ¶ 35.  In addition, "[h]er

office hours were basically nonexistent.  [Her colleagues] never knew when she would be in and

when she wouldn't be in."  *See* DSUMF, ¶ 14; *see also id.*, ¶ 25 (coworkers complained that "'no

one' at CBS News trusted Plaintiff's judgment and that '[n]o one can ever find her;'" that "[n]o

one knows where [Kia] is or what she's doing;" and that Plaintiff "never comes to work.")

(alterations in original).  Plaintiff concedes that her job performance was poor during this period.

*See* PUF, ¶¶ 6 (no dispute that "Plaintiff 'wasn't pulling her weight'" and was taking "too long to

meet deadlines"), 28 (no dispute that leadership in D.C. Bureau "reiterated" Plaintiff's poor

performance), 29 (no dispute that Plaintiff's supervisor received reports of Plaintiff's poor

performance).

In response to complaints from numerous sources about Baskerville, Godwin arranged a

meeting with Baskerville in New York, on February 5, 2018; Maria Cottone, Vice President of

Human Resources, was also present.  *See* DSUMF, ¶¶ 28–31; PUF, ¶¶ 28–31.  At the meeting,

Godwin told Baskerville about the negative feedback she had received from Baskerville's

coworkers.  *See* DSUMF, ¶ 32; PUF, ¶ 32.  Baskerville responded that she had been feeling

depressed, mainly due to personal and family issues.  *See* DSUMF, ¶ 33; PSUMF ¶ 38.  This was

the first time that Baskerville shared with Godwin that she had any mental-health issue or

personal problem.  *See* DSUMF, ¶ 34; PUF, ¶ 34.  Godwin left the meeting to allow Baskerville

to discuss personal issues with Cottone, and asked Cottone to assist Baskerville from a human

resources perspective.  *See* DSUMF, ¶ 37; PSUMF ¶ 40.  Baskerville and Cottone discussed

resources and "how [CBS] can help;" Cottone told Baskerville about the Employee Assistance

Program and counseling services, CBS's disability process, and the possibility of Family

Medical Leave.  *See* PSUMF, ¶ 40; Def. Resp. at 18–19.

       With Godwin and Cottone's support, Baskerville took thirteen weeks of short-term

medical leave to deal with her personal problems, from February 6, 2018, until April 30, 2018.

*See* DSUMF, ¶¶ 38–40, 51; PUF, ¶¶ 38–40, 51.  The paperwork approving her leave lists

"Employee[']s Own Illness or Injury" as the sole reason.  *See* PSUMF, ¶ 42; Def. Resp. at 19.

During her leave, Baskerville sought psychological and psychiatric care.  *See* PSUMF, ¶ 43; Def.

Resp. at 20.  An "Attending Provider's Statement," dated February 26, 2018, states that

Baskerville's "primary disabling diagnosis" was "depression" with "comorbidities" of "anxiety,

insomnia."  *See* PSUMF, ¶ 45; Def. Resp. at 20.  Baskerville also claims that she was diagnosed

with pre-menopausal dysphoric disorder ("PMDD").  *See* PSUMF, ¶ 43.  According to

Baskerville, "PMDD is a condition that affects women 'as they age and get closer to

menopause . . . It makes you anxious, you're irritable, [and] there are incredible mood swings

with no explanations for why.  It's very difficult to concentrate.'"  *See* PSUMF, ¶ 43 (alterations

in original).  CBS strongly disputes that Baskerville was "diagnosed" with PMDD, arguing that

there is no evidence of an official diagnosis by a doctor, and that Baskerville diagnosed herself

with PMDD based on Internet research.  *See* DSUMF, ¶¶ 43, 45; Def. Mot. at 7 ("[Baskerville]

has not offered any expert opinion or other medical evidence regarding her alleged disability.  To

this day, [Baskerville] has not received a formal diagnosis of PMDD.").

When Baskerville returned to work on April 30, 2018, CBS accommodated her doctor's recommendation that she work on a part-time basis before transitioning to a full-time schedule. *See* PSUMF, ¶¶ 45–46; Def. Resp. at 21 (agreeing that CBS "granted all work restrictions requested by Plaintiff/her medical providers"). Baskerville claims that, upon her return to work, she told Godwin that she had been diagnosed with PMDD, and that the two discussed the condition at length. *See* PSMFD at 33. Godwin then allegedly told Baskerville that she "[had] a clean slate," which Baskerville took to mean that "everything that had been reported back to [Godwin] didn't matter" and that they "[were] never going to talk about it again." *Id.*[3]

Not long after Baskerville returned to work, on June 8, 2018, a CBS intern experienced "a mental health episode" in the CBS building and was taken to the hospital. *See* DSUMF, ¶¶ 54–55; PSUMF, ¶ 49. Because Baskerville was not in the office at the time, a co-worker called her and told her what had happened. *See* DSUMF, ¶¶ 56–57; PUF, ¶¶ 56–57. Baskerville then spoke to Godwin. Although Baskerville told Godwin that she would go to the hospital to monitor the situation, she instead told another student intern to go to the hospital to be her "eyes and ears." *See* DSUMF, ¶¶ 59–60; PUF, ¶¶ 59–60; PSUMF, ¶ 49. Baskerville then went to the office, where she was told by another CBS employee that "it was inappropriate to have an intern get involved in another intern's medical situation." DSUMF, ¶ 61; PUF, ¶ 61; PSUMF, ¶ 50.

---

[3]       According to Baskerville,

> When she returned to work, she "made every effort to try and be normal and get back and be a part of the family" even though she "still didn't feel at 100 percent." Upon her return, she had a discussion with Godwin in which she "revealed to her what the diagnosis was. And [Godwin] had not heard of it" so Baskerville explained the condition to her. They "talked it out" and Godwin "specifically said to [Baskerville], 'You have a clean slate.'" Baskerville "felt that it was genuine" and understood it to mean that "everything that had been reported back to her didn't matter. . . . it's done, we're never going to talk about it again. And [Baskerville] was grateful." She felt like Godwin "was extending [her] a lifeline. In this meeting with Godwin, Baskerville "was very transparent" that she "still wasn't 100 percent."

*See* PSMFD at 33 (alterations in original).

After receiving this feedback, Baskerville went to the hospital and remained there until it became clear that the intern would need to stay in the hospital overnight. *See* PSUMF, ¶¶ 50–51; Def. Resp. at 24–25. Godwin was notified that Baskerville had sent a second intern to the hospital in her stead and considered this a serious lapse of judgment. *See* DSUMF, ¶¶ 63, 67–68; PUF, ¶ 63. The parties dispute whether Baskerville was honest with Godwin about what had happened. Baskerville claims that she told Godwin on June 12, 2018, that she had sent the second intern to the hospital, *see* PSMFD at 50; but CBS asserts that "Godwin spoke to [Baskerville] multiple times during and after the incident, and each time [Baskerville] omitted that she had sent another intern to the hospital." *See* DSUMF, ¶ 75.

On June 13, 2018, Baskerville met with Godwin and Cottone in New York. *See* DSUMF, ¶ 77; PSUMF, ¶ 53. Godwin informed Baskerville that her employment would be terminated effective that day. *See* DSUMF, ¶ 82; PSMFD at 53–54. According to CBS, the decision to terminate Baskerville was based on her poor judgment in handling the intern's medical incident on June 8, 2018; her dishonesty about what had occurred; and her history of poor job performance. *See* DSUMF, ¶ 82.

Baskerville filed the instant suit in the Superior Court of the District of Columbia on September 20, 2018; and CBS removed the case to this Court on October 31, 2018. Baskerville alleges that: (1) CBS discriminated against her on the basis of her disability, which she identifies as "anxiety and clinical depression due to [PMDD]," in violation of the DCHRA, *see* Compl., ¶¶ 39–47 (citing D.C. Code § 2.1401.01 *et seq.*); and (2) CBS unlawfully retaliated against Baskerville for taking medical leave, in violation of the DCFMLA, *see* Compl., ¶¶ 48–54 (citing D.C. Code § 32-507 *et seq.*). On November 22, 2019, CBS filed the instant Motion for Summary Judgment.

6

**LEGAL STANDARD**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record — including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence — in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. *See* Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *See Ass'n of Flight Attendants-CWA, AFL-CIO v. DOT*, 564 F.3d 462, 465–66 (D.C. Cir. 2009). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." *See* Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with all justifiable inferences drawn in her favor.

*Liberty Lobby*, 477 U.S. at 255.  If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate.  *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).  The district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Liberty Lobby*, 477 U.S. at 251–52.  In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Liberty Lobby*, 477 U.S. at 249–50 (internal citations omitted).

In recognition of the difficulty of uncovering clear evidence of discriminatory or retaliatory intent, the district court should approach summary judgment in an action for employment discrimination or retaliation with "special caution."  *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879–80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc).  But the court's "special caution" does not relieve the plaintiff of her burden to support her allegations with competent evidence.  *See Brown v. Mills*, 674 F. Supp. 2d 182, 188 (D.D.C. 2009).  As in any context, where the plaintiff would bear the burden of proof on a dispositive issue at trial, at the summary judgment stage she bears the burden of production to designate specific facts showing that there exists a genuine dispute requiring trial.  *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).  Otherwise, the plaintiff could effectively defeat the "central purpose" of the summary judgment device — namely, "to weed out those cases insufficiently meritorious to warrant . . . trial" — simply by offering conclusory allegations, speculation, and argument.  *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

**ANALYSIS**

In its Motion for Summary Judgment, CBS argues that Baskerville's disability-discrimination claim fails because she does not have a disability; and even if she did, CBS has proffered legitimate, non-discriminatory reasons for her termination that overcome any allegation of improper motive. *See* Def. Mot. at 11–17. CBS further argues that Baskerville's retaliation claim hinges on the close temporal proximity between her medical leave and her termination, but that is insufficient to overcome the legitimate, non-discriminatory reasons that support CBS's decision to terminate her employment. *Id.* at 17–19.

**I.      Disability Discrimination Under the DCHRA**

The DCHRA prohibits covered employers from terminating any employee "wholly or partially for a discriminatory reason based upon [an] actual or perceived . . . disability. . . ." *See* D.C. Code § 2–1402.11(a). To demonstrate discrimination in violation of the DCHRA, a plaintiff must establish that she:  (1) has a disability within the meaning of the statute; (2) was qualified for the position with or without a reasonable accommodation; and (3) suffered an adverse employment action because of the disability. *See Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 5 (D.C. Cir. 2015). Here, it is undisputed that Baskerville was qualified for her position as Manager of Staff Development and Diversity Initiatives, *see generally* Def. Mot. Thus, the Court's analysis focuses on whether Baskerville has proffered evidence that she has a disability under the DCHRA and whether CBS terminated her because of that disability.

A.      <u>Evidence of Disability</u>

Baskerville identifies her disability as "anxiety and clinical depression due to [PMDD]." *See* Compl., ¶ 42. The DCHRA defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of an individual having a record of

such an impairment or being regarded as having such an impairment." *See* D.C. Code § 2-1401.02(5A).  CBS argues that Baskerville was never officially diagnosed with PMDD; that CBS did not regard her as having a disability; and that her symptoms did not substantially limit one or more major life activities. *See* Def. Mot. at 11–13; Def. Reply at 14–16, 16–18.

To begin, CBS argues that there is no genuine dispute that Baskerville is not disabled. *See* Def. Mot. at 12–13; Def. Reply at 14–16.  To establish a "record" of her alleged impairment, Baskerville may provide evidence of "a history of" anxiety and clinical depression due to PMDD, through documentation such as medical records. *See Adams v. Rice*, 531 F.3d 936, 946 (D.C. Cir. 2008) (noting that "record of" disability claims "will often involve tangible documents of some kind, such as medical reports or employment forms detailing a [] medical condition"); *see also Ellis v. Georgetown Univ. Hosp.*, 723 F. Supp. 2d 42, 50 (D.D.C. 2010) (considering a plaintiff's medical records as evidence of a record of impairment); *Adams v. Rice*, 484 F. Supp. 2d 15, 21 (D.D.C. 2007), *rev'd on other grounds*, 531 F.3d 936 (D.C. Cir. 2008) ("A record of impairment means that a person has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." (internal quotation marks and citation omitted)).  But the only evidence that Baskerville "received a diagnosis of [PMDD]" is her own testimony, *see* Pl. Opp. at 23; PSUMF, ¶ 43; moreover, some of that testimony does not support her claim, as Baskerville acknowledged at her deposition that she did not receive an "official diagnosis." *See* ECF No. 27-5 (Baskerville Deposition) at 345:22–346:18 (describing the reaction of her psychiatrist to the possibility of a PMDD diagnosis as "kind of flippant" and noting that "[h]e said that's possible but it could be other things as well"); *id.* at 359:6–360:7 (testifying that she "asked [her doctor] did she think it could

be PMDD, because I did my own research," and that her doctor answered "yes, I do").[4]

Baskerville's mere belief that she has PMDD cannot support a finding that she has a "record" of

suffering from that condition.  *See Adams*, 484 F. Supp. 2d at 21; *see also Ass'n of Flight

Attendants-CWA, AFL-CIO*, 564 F.3d at 465–66 (on summary judgment, the court "must assume

the truth of all statements proffered by the non-movant except for conclusory allegations lacking

any factual basis in the record." (quoting *Dist. Intown Props. Ltd. P'ship v. District of Columbia*,

198 F.3d 874, 878 (D.C. Cir. 1999)).  Thus, Baskerville fails to identify evidence of any "record"

that she suffers from the impairment that underlies her claim of discrimination.  *See Adams*, 531

F.3d at 946.

      Nor has Baskerville proffered evidence that her supervisors at CBS "regarded" her as

having a disability.  *See* D.C. Code § 2-1401.02(5A).  To establish that her employer "regarded

her" as disabled, Baskerville must show that "(1) [she] was perceived to have a physical

impairment and (2) the impairment was perceived to substantially limit one or more of [her]

major life activities."  *See Lytes v. D.C. Water & Sewer Auth.*, 527 F. Supp. 2d 52, 61–62

(D.D.C. 2007), *aff'd*, 572 F.3d 936 (D.C. Cir. 2009) (citation omitted); *Haynes v. Williams*, 392

F.3d 478, 481 n.2 (D.C. Cir. 2004) (holding that to succeed, a plaintiff must prove that her

employer believed she had a physical impairment that substantially limited one or more major

life activities).  Baskerville's only proffered evidence on this point is her own testimony that she

told Godwin of her diagnosis with PMDD when she returned to work after her medical leave.

---

[4]     In its Order granting, in part, Defendant's Renewed Motion to Strike, the Court struck Baskerville's responses to CBS's assertion that she "has not received a formal diagnosis of PMDD from any medical provider." *See* ECF No. 47 (Order on Motion to Strike); *see also* DSUMF, ¶ 45; PSMFD at 37.  As a result, CBS's contention that Baskerville was never diagnosed with PMDD is conceded.  *See Skybridge Spectrum Found. v. FCC*, 842 F. Supp. 2d 65, 70 n.1 (D.D.C. 2012) (treating as conceded non-contested factual assumptions, especially where a party has "defied the Court's clear and unambiguous instructions" to correctly respond to a Statement of Undisputed Material Facts).  In any event, as discussed, *supra*, the record is devoid of evidence that a doctor diagnosed Baskerville with PMDD.

*See* PSMFD at 33 (describing that Baskerville "revealed to [Godwin] what the diagnosis was" and explained what PMDD entailed).[5]  Even assuming that the conversation with Godwin took place, which CBS disputes,[6] that would not be enough to prove that CBS regarded Baskerville as having a disability within the meaning of the DCHRA.  According to Baskerville, she told Godwin during the alleged conversation only that she had been diagnosed with PMDD and that she "was not 100 percent."  *Id.*  But Godwin's alleged knowledge that Baskerville had PMDD and was not feeling well is insufficient — Baskerville must proffer evidence that Godwin perceived the condition as an impairment that substantially limited one or more of Baskerville's major life activities.  *See Chisholm v. D.C.*, 666 F. Supp. 2d 96, 110 (D.D.C. 2009) ("The mere fact that the defendant knows about the impairment is not enough [for a plaintiff] to succeed.").  Baskerville cites no such evidence in the record.  Accordingly, there is no material dispute that her employer did not perceive her to have a disability under the DCHRA.

Baskerville has also identified anxiety and depression as disabling conditions that gave rise to CBS' disability discrimination.  *See* Compl., ¶ 42; Pl. Opp. at 22–25.  Those conditions are documented in Baskerville's medical records.  *See Adams*, 531 F.3d at 946.  On February 26, 2018, Baskerville's attending provider noted her "primary disabling diagnosis" as "depression" and included "anxiety" as a relevant comorbidity.  *See* PSUMF, ¶ 45; *see also* ECF No. 22-9 (Plaintiff's Ex. 31 Medical Records from February 8, 2018) (showing diagnosis of "depressive disorder").  Baskerville also has provided medical records as far back as December 2015

---

[5]     As evidence that CBS was on notice of her mental health struggles, Baskerville also points to her email of January 17, 2018, in which Baskerville wrote to Cottone:  "I'm reaching out because I need your confidential advice and hopefully support.  It's about me - no one else.  Do you have anytime [sic] to talk this week?"  *See* ECF No. 21-9 (Plaintiff's Ex. 8 Baskerville's Email to Cottone).  Such an oblique email is insufficient to put an employer on notice of any potential disability.

[6]     CBS disputes that the alleged "clean slate" comment was ever made; as evidence of this, it points to Godwin's testimony that she likely would not have used the words "clean slate" in the context alleged by Baskerville.  *See* Def. Reply at 10 (citing Godwin Dep. at 83:20–84:15, 116:20–117:22).

showing treatment for depression.  *See* ECF No. 22-1 (Plaintiff's Ex. 7 Medical Records).  That evidence appears to show a record of depression and anxiety as required by the DCHRA.  *See Liberty Lobby*, 477 U.S. at 255.

Baskerville has failed to proffer evidence, however, that her depression and anxiety "substantially limit[ed] one or more of [her] major life activities."  *See* D.C. Code § 2-1401.02(5A).  Indeed, to establish disability, a "plaintiff must do more than merely submit evidence of a medical impairment;" she must show "she was severely impacted by her impairment."  *Etheridge v. FedChoice Fed. Credit Union*, 789 F. Supp. 2d 27, 38 (D.D.C. 2011) (citing *Adams v. Citizens Advice Bureau*, 187 F.3d 315, 316 (2d Cir. 1999) (per curiam)); *Ellis v. Georgetown Univ. Hosp.*, 723 F. Supp. 2d 42, 48 (D.D.C. 2010) ("[M]erely having an impairment does not make [an individual] disabled for the purposes of the [DCHRA]." (citation omitted)).  Major life activities have been defined as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Green v. Am. Univ.*, 647 F. Supp. 2d 21, 29 (D.D.C. 2009) (quoting *Bragdon v. Abbott*, 524 U.S. 624, 638–39 (1998)).  To demonstrate that an impairment substantially limits a major life activity, "plaintiffs must show that their limitation [is] substantial 'as compared to the average person in the general population.'"  *Desmond v. Mukasey*, 530 F.3d 944, 955 (D.C. Cir. 2008) (quoting *Singh v. George Washington Univ. Sch. of Med.*, 508 F.3d 1097, 1100–04 (D.C. Cir. 2007)).

Baskerville argues that her impairments substantially limited her ability to work, as demonstrated by her need to take thirteen weeks of medical leave.  *See* Pl. Opp. at 24–25. Although working is considered a major life activity, *Duncan v. Washington Metropolitan Area Transit Authority*, 240 F.3d 1110, 1114 n.1 (D.C. Cir. 2001), Baskerville's argument appears to

13

conflate her ability to work with her ability to do a good job.  There is no dispute that Baskerville

was able to work, despite her anxiety and depression.  *See* Baskerville Dep. at 398:12–19

(testifying that she "always forced" herself to go to work); *see also id.* at 367:15–18 (testifying

that she continues to work in a new job).  The record reflects that Baskerville took medical leave

to address personal issues because coworkers complained about *the way she did her job* — not

because she could not do the work at all.  This point is reinforced by the fact that Baskerville's

alleged disability has not interfered with her ability to work at her new job.  *See* DSUMF, ¶ 50;

PSMFD at 42 (failing to dispute this fact); *see also Haynes*, 392 F.3d at 482–83 (noting that "if

the symptoms of an impairment are brought on by a single workplace, such an impairment is not

substantially limiting"); *Klute v. Shinseki*, 840 F. Supp. 2d 209, 217 (D.D.C. 2012) ("There is an

abundance of authority making clear that impairments developed or exacerbated [by specific

workplaces] do not constitute a disability.").  Thus, Baskerville proffers no evidence that her

limitations were "substantial as compared to the average person in the general population."

*Desmond*, 530 F.3d at 955.

Baskerville contends, however, that CBS's approval of her medical leave "is itself an

acknowledgment that CBS regarded Baskerville as too disabled to work."  *See* Pl. Opp. at 25.

This argument is unavailing because the standard that an employee must meet to qualify for

medical leave under the DCFMLA is different from the standard for establishing disability under

the DCHRA.  The DCFMLA provides a limited period of medical leave to any employee "who

becomes unable to perform the functions of the employee's position because of a serious health

condition."  *See* D.C. Code § 32-503.  The DCFMLA defines "serious health condition" quite

broadly, to include any "physical or mental illness, injury, or impairment that involves:  (A)

[i]npatient care in a [medical facility]; or (B) [c]ontinuing treatment or supervision at home by a

health care provider . . . ."  *See* D.C. Code § 32-501(9).  Examples of such conditions include

pregnancy, recovery from surgery, and treatment due to a chronic health condition such as

diabetes or asthma.  *See, e.g.*, *Holmes v. Univ. of the D.C.*, 244 F. Supp. 3d 52, 58 (D.D.C. 2017)

(pregnancy); *Thomas v. D.C.*, 227 F. Supp. 3d 88, 98 (D.D.C. 2016) (recovery from surgery).

By contrast, the DCHRA prohibits discrimination against employees who are disabled

but otherwise are qualified for their jobs and able to perform the "essential functions" of their

positions.  *See McNair v. D.C.*, 11 F. Supp. 3d 10, 14 (D.D.C. 2014) (noting that to meet the

definition of disability, an employee must be able to "perform the essential functions of the

employment position that such individual holds or desires," with or without reasonable

accommodations (citing *Woodruff v. Peters*, 482 F.3d 521, 527 (D.C. Cir. 2007)); D.C. Code § 2-

1401.01.  An employee who is classified as "disabled" under the DCHRA is entitled to

reasonable accommodations and protection from discrimination;[7] and the definition of

"disability" under the statute is thus more demanding:  An employee must show that she has "a

physical or mental impairment that substantially limits one or more of [her] major life

activities . . . ."  *See* D.C. Code § 2-1401.02(5A).  "A temporary inability to work" while

recovering from an injury or illness might warrant medical leave under the DCFMLA, but it

"does not constitute evidence of a disability covered by the [DCHRA]."  *Adams*, 531 F.3d at

947; *see also Foley v. Holder*, 598 F. App'x 2, 4 (D.C. Cir. 2015); *Belton v. Snyder*, 249 F. Supp.

3d 14, 24 (D.D.C. 2017); *Klute*, 840 F. Supp. 2d at 216; *Powell v. Castaneda*, 390 F. Supp. 2d 1,

12 (D.D.C. 2005).[8]

---

[7]     Employers must "reasonabl[y] accomodat[e] the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee."  *See Bradley v. D.C. Pub. Sch.*, 222 F. Supp. 3d 24, 28 (D.D.C. 2016) (jointly analyzing requirements of ADA and DCHRA) (citation omitted).
[8]     The relationship between the DCFMLA and the DCHRA is parallel to the relationship between the statutes' federal counterparts, the Family and Medical Leave Act ("FMLA") and the Americans with Disabilities Act ("ADA").  *See Giles v. Transit Employees Credit Union*, 32 F. Supp. 3d 66, 70 (D.D.C. 2014), *aff'd sub nom. Giles v. Transit Employees Fed. Credit Union*, 794 F.3d 1 (D.C. Cir. 2015), *cert. denied*, 577 U.S. 1148 (2016); *Grant v.*

The record here does not reflect that CBS regarded Baskerville as disabled under the DCHRA when it approved her medical leave under the DCFMLA. CBS approved Baskerville's request for medical leave "to deal with her personal issues," after Baskerville shared with her supervisors that she was "feeling depressed" and struggling with "caring for her mother and . . . marital difficulties." *See* DSUMF, ¶¶ 33, 38; PUF, ¶ 38; PSMFD at 27. The stated reason on the paperwork approving Baskerville's leave was "Employee[']s Own Illness or Injury." *See* PSUMF, ¶ 42; Def. Resp. at 19. Although Baskerville's condition must be considered "a serious health condition" to justify leave under the DCFMLA, *see* D.C. Code § 32-503, the mere approval of her medical leave by CBS was not a concession that CBS considered her disabled under the DCHRA. As discussed, *supra*, Baskerville has not proffered evidence that her alleged disability substantially limited a major life activity, as required by the DCHRA; and she may not rely solely on the approval of her DCFMLA leave to establish her disability.

B. Evidence of Causation

Baskerville's claim of disability discrimination also fails because she has provided no evidence of causation, *i.e.*, that she was terminated because of her alleged disability. In order to prove discrimination under the DCHRA, Baskerville must connect her alleged disability (anxiety and depression caused by PMDD) with the adverse employment action at issue (her termination). *See Duncan*, 240 F.3d at 1114. In other words, Baskerville is required to proffer evidence that CBS fired her because she had anxiety and depression caused by PMDD. She has not done so. According to Baskerville, Godwin was made aware of Baskerville's alleged diagnosis of PMDD

---

*May Dep't Stores Co.*, 786 A.2d 580, 583–84 (D.C. 2001). The Equal Opportunity Commission, which administers both federal statutes, has clarified that "[a]n FMLA 'serious health condition' is not necessarily an ADA 'disability.'" *See EEOC Guidance on the Family Medical Leave Act, the ADA, and Title VII of the Civil Rights Act of 1964*, https://www.eeoc.gov/laws/guidance/family-and-medical-leave-act-ada-and-title-vii-civil-rights-act-1964 -:~:text=ADA%20%22disability%22%3F-,A%3A%20No.,as%20having%20such%20an%20impairment. Indeed, "the fact that an individual has a record of a 'serious health condition' does not necessarily mean that [she] has a record of an ADA disability" nor that her employer "regards [her] as having an ADA disability." *Id.*

only a month and a half before she was terminated; and Godwin reacted to the disclosure by reassuring Baskerville that she had a "clean slate." *See* PSMFD at 33.  Moreover, Baskerville concedes that CBS was supportive of her medical leave and her transition back to work on a part-time basis. *See* PUF, ¶¶ 39–40; PSUMF, ¶ 40.  Thus, there is no direct evidence of discriminatory animus on the part of CBS.[9]  Nor can discrimination be inferred from the timing of Baskerville's termination because CBS proffers legitimate, non-discriminatory reasons for the adverse employment action, as discussed in detail, *infra. Waggel v. George Washington Univ.*, 957 F.3d 1364, 1374 (D.C. Cir. 2020) (holding that a plaintiff failed to show that her employer "took adverse employment actions against her 'because of' her disability" where the plaintiff relied on tenuous inferences and the employer proffered legitimate, non-discriminatory reasons); *cf. Miles v. Howard Univ.*, 653 F. App'x 3, 9 (D.C. Cir. 2016) ("Temporal proximity, standing

---

[9]        "Direct evidence of discrimination is evidence that, if believed by the fact finder, proves the particular fact in questions *without any need for inference.*" *Brown v. Small*, 437 F. Supp. 2d 125, 130 n.7 (D.D.C. 2006) (emphasis in original) (citation omitted)).  The parties agree that Baskerville has offered no direct evidence of discrimination. *See* Pl. Opp. at 21–25 (noting that "where there is no direct evidence of disability discrimination, the Court utilizes" the *McDonnell Douglas* framework, and proceeding to apply that framework).
        Moreover, Baskerville's attempt to rely on circumstantial evidence to show discriminatory animus fails. *See* Pl. Opp. at 32–33 (arguing that CBS's proffered reasons for her termination are "tainted by CBS's discriminatory animus toward her").  Although Baskerville asserts that CBS "assessed her performance more critically and disciplined her more harshly than her peers," she has provided no comparator evidence to support this claim of disparate treatment — *i.e.*, she has not demonstrated that a similarly situated employee was assessed or disciplined less harshly even though "all of the relevant aspects of [her] employment situation were nearly identical to those of the [other] employee." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (describing the high bar for comparator evidence).  Nor is the Court persuaded by Baskerville's assertion that CBS's "unrealistically high expectations for her performance" when she returned from medical leave are evidence of discriminatory or retaliatory intent.  Even putting aside the tenuous chain of logic that underlies that argument, the evidence she points to consists only of Isham's testimony that she was not available in the office to handle the June 8 intern incident and her own belief that employees of CBS were treating her differently. *See* Pl. Opp. at 32 (citing DSUMF, ¶ 72; PSUMF, ¶¶ 47–48).  Evidence that consists of "nothing more than unsubstantiated rumors, conclusory allegations, and subjective beliefs, is wholly insufficient to establish an inference of discrimination." *Brandli v. Micrus Endovascular Corp.*, 209 F. Supp. 3d 356, 363 (D.D.C. 2016), *aff'd*, 709 F. App'x 7 (D.C. Cir. 2017) (cleaned up).  Finally, Baskerville's reliance on the lack of "a training program for how to deal with employees with medical conditions or how to identify mental health problems in the workplace" is also misplaced. *See* Pl. Opp. at 33.  The lack of such a training program does not support an inference of specific discriminatory intent. *See Robinson v. Duncan*, 775 F. Supp. 2d 143, 153 (D.D.C. 2011) ("[A] court may not 'second guess an employer's personnel decision absent [a] demonstrably discriminatory motive.'" (quoting *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)).

alone, cannot rebut an employer's legitimate, non-discriminatory reason for an adverse

employment action.").  On a motion for summary judgement, a plaintiff's bare conclusory

assertions that she was terminated because of her alleged disability are insufficient to create a

genuine issue of material fact.  *See Harding v. Gray,* 9 F.3d 150, 154 (D.C. Cir. 1993); *accord*

*Sage v. Broadcasting Publ'ns, Inc.,* 997 F. Supp. 49, 53 (D.D.C. 1998); *McCain v. CCA of Tenn.,*

*Inc.,* 254 F. Supp. 2d 115, 119 (D.D.C. 2003).

      For all of the foregoing reasons, Baskerville has not mustered sufficient evidence of

disability discrimination to present a triable issue of fact.

      C.    <u>Failure to Rebut Legitimate, Non-Discriminatory Reasons for Termination</u>

      Alternatively, CBS argues that even assuming that Baskerville has presented evidence of

disability discrimination, CBS is entitled to summary judgment because she fails to rebut its

legitimate, non-discriminatory reasons for terminating her.  *See* Def. Mot. at 13–17; Def. Reply

at 6–9.  On summary judgment, the Court applies a truncated version of the burden-shifting

framework for examining discrimination claims articulated in *McDonnell Douglas Corp. v.*

*Green,* 411 U.S. 792 (1973); *see also Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199

F.3d 1365, 1367 (D.C. Cir. 2000) ("The burden-shifting analysis of *McDonnell Douglas* . . . is

applicable to [DCHRA] claims.").[10]  Once the employer proffers a legitimate, non-discriminatory

---

[10]      Under the traditional framework, a plaintiff bears the initial burden of establishing a prima facie case of discrimination; if she does, then the employer must articulate a legitimate, non-discriminatory reason for its action; and the plaintiff then has a final opportunity to show that the employer's reason was a pretextual cover for discrimination.  *McDonnell Douglas,* 411 U.S. at 802; *see, e.g., Gleklen,* 199 F.3d at 1367; *Giles,* 794 F.3d at 5.  On summary judgment, the Court does not consider whether Plaintiff has made out a prima facie case, but instead proceeds to the second and third parts of the analysis.  *See Brady v. Office of Sergeant at Arms,* 520 F.3d 490, 493 (D.C. Cir. 2008) (stating that on summary judgment, if the employer puts forth a "legitimate, non-discriminatory reason" for its actions, the "question whether the employee actually made out a prima facie case is no longer relevant.") (internal citations and quotation marks omitted); *id.* at 494 ("[W]here an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not — *and should not* — decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*.") (emphasis in original).

reason for the adverse employment action, "the district court must resolve one central question:

Has the employee produced sufficient evidence for a reasonable jury to find that the employer's

asserted non-discriminatory reason was not the actual reason and that the employer intentionally

discriminated against the employee[?]"  *Brady*, 520 F.3d at 494 (citations omitted); *see*

*also Furline v. Morrison*, 953 A.2d 344, 353 (D.C. 2008) (noting that in evaluating DCHRA

claim, the Court "need not pause to analyze whether [plaintiff] made out a prima facie case"

because defendant "produced evidence that it suspended [plaintiff] for a legitimate, non-

discriminatory reason").  If a plaintiff fails to produce such evidence of pretext, then summary

judgment in favor of the employer is proper.  *See Brady*, 520 F.3d at 496–97.

### 1.    *Legitimate, Non-Discriminatory Reasons*

In general, an employer's burden to articulate a legitimate, non-discriminatory reason

for its decision to terminate an employee is not unduly "stringent."  *Milton v. Weinberger*, 696

F.2d 94, 98 (D.C. Cir. 1982).  Courts in this jurisdiction have held that legitimate non-

discriminatory reasons for termination include lateness, consistent absence or poor attendance,

and employer dissatisfaction with employee's behavior in the office.  *See Siddique v. Macy's*,

923 F. Supp. 2d 97, 105 (D.D.C. 2013); *Luhrs v. Newday, LLC*, 326 F. Supp. 2d 30, 34 (D.D.C.

2004); *Chang v. Inst. for Public-Private P'ships, Inc.*, 846 A.2d 318, 325–326 (D.C. 2004).

Here, CBS provides two reasons for Baskerville's termination:  (1) her poor work performance;

and (2) her lack of judgment and her dishonesty in handling an intern's hospitalization on June 8,

2018.  *See* Def. Mot. at 13–17; Def. Reply at 7.

With respect to Baskerville's work performance, it is undisputed that, after she started

managing the internship program in 2016, she "wasn't pulling her weight" and "she was taking

too long to meet deadlines."  *See* PUF, ¶ 6; *see also* PSMFD at 17 (failing to dispute that "there

was a general loss of confidence in [Baskerville's] management capabilities to run the intern program"); *id.* at 18 (failing to dispute that "basically anybody who had anything to do with interns had a problem with [] Baskerville");  PSMFD at 20 (concession by Baskerville that she "wasn't doing her job" and confirming that she was often absent and failed to complete her work); Pl. Opp. at 31 ("Baskerville does not dispute that, as a result of her severe medical issues in 2017 and early 2018, she was not performing to the best of her ability before she took her FMLA leave.").[11]  Among the many legitimate reasons an employer might give for terminating an employee, the simplest one is:  "[S]he was a poor employee."  *Giles*, 794 F.3d at 6.  CBS's performance-based reason for terminating Baskerville is plainly both legitimate and non-discriminatory.

CBS's second reason for terminating Baskerville — her mishandling of the June 8 intern incident — is also legitimate and non-discriminatory.  On June 8, 2018, one of CBS's student interns experienced a mental-health incident that required a trip to the hospital.  *See* DSUMF, ¶¶ 54–55; PUF, ¶¶ 54–55.  Instead of reporting to the hospital to manage the situation, as she told her supervisor she would do, Baskerville sent a second intern to the hospital to be her "eyes and ears."  *See* PUF, ¶¶ 54–61; PSUMF, ¶¶ 49–50.  According to CBS, Baskerville's poor judgment in this instance was "an independent, legitimate basis for her termination."  *See* Def. Mot. at 15; DSUMF, ¶¶ 69, 71 (Godwin was "extremely concern[ed]" by the incident and the "extremely poor judgment" Baskerville displayed in sending another student to the hospital).  Although the parties dispute whether Baskerville was also dishonest about the incident, that dispute is not material because Baskerville concedes that she sent another student to the hospital when it was

---

[11]     In its Order granting, in part, Defendant's Renewed Motion to Strike, the Court struck Baskerville's responses to CBS's proffered facts regarding Baskerville's poor performance.  *See* Order on Motion to Strike; *see also* DSUMF, ¶¶ 10–13, 15–17, 20, 21, 23–27, 48; PSMFD at 16–26, 41.  In any event, the stricken responses did not contest the deficiency in her job performance prior to her medical leave.

her own responsibility to go there.  *See* PUF, ¶¶ 54–61; PSUMF, ¶¶ 49–50.  Baskerville's lack of

judgment, in and of itself, is a legitimate, nondiscriminatory reason for CBS to terminate her

employment.

> 2.    *Insufficient Evidence of Pretext*

Where, as here, "an employer asserts a legitimate, non-discriminatory reason for an

adverse employment action," the remaining question is "whether the plaintiff produced sufficient

evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was

not the actual reason and that the employer intentionally discriminated against the plaintiff on a

prohibited basis."  *Adeyemi v. District of Columbia,* 525 F.3d 1222, 1226 (D.C. Cir. 2008).

Evidence of pretext may include "variant treatment of similarly situated employees,

discriminatory statements by decision makers, and irregularities in the stated reasons for the

adverse employment decision."  *Bennett v. Solis*, 729 F. Supp. 2d 54, 60 (D.D.C. 2010)

(citing *Brady*, 520 F.3d at 495 n.3).

Baskerville attempts to rebut CBS's proffered reasons for terminating her with three

pieces of evidence:  (1) Godwin's alleged promise that Baskerville had a "clean slate" after her

medical leave; (2) CBS's alleged failure to adhere to its own progressive disciplinary policy; and

(3) Godwin's "lack of credibility" when she denied that she had any awareness of Baskerville's

medical issues.  *See* Pl. Opp. at 34–38.  None of this evidence is sufficient to create a genuine

issue of material fact as to whether CBS's asserted reasons for terminating Baskerville were a

pretext for disability discrimination.

First, Baskerville argues that CBS's reliance on her poor performance before she took her

medical leave "contradict[s] the explicit assurance" from Godwin that Baskerville had a "clean

slate;" and that such "contradictory positions" show discriminatory intent.  *See* Pl. Opp. at 36.

Even assuming that Godwin did promise Baskerville a "clean slate,"[12] those words are subject to interpretation and do not bear the legal significance that Baskerville wishes to place on them. Although Baskerville apparently interprets Godwin's alleged statement as some sort of waiver of CBS's right to consider Baskerville's pre-leave conduct, Baskerville provides no analysis or legal authority to support such a theory. *See id.* CBS was under no legal obligation to ignore Baskerville's concededly poor job performance in making its termination decision. Although "shifting and inconsistent *justifications* [for an adverse employment action] are probative of pretext," *see Small v. Office of Congressman Henry Cuellar*, 485 F. Supp. 3d 275, 282 (D.D.C. 2020) (emphasis added), there is no such inconsistency here. *See also Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011) (noting that difference between defendant's stated rationale for adverse employment action in summary judgment briefing and contrary reasons provided in deposition testimony and interrogatory responses are "probative of pretext"). CBS's stated reasons for Baskerville's termination have not changed over the course of this litigation; and the alleged "contradiction" cited by Baskerville — *i.e.*, that she was terminated after being promised a clean slate — concerns an immaterial fact that does not support a finding of pretext.

Baskerville next asserts that CBS's failure to give her a written warning prior to terminating her employment — purportedly in violation of CBS's personnel policies — constitutes evidence of pretext. *See* Pl. Opp. at 36–37. This argument appears to reflect a lack of familiarity with the applicable policy: CBS's Policy Guide provides that "management employees . . . may be terminated without a written warning." *See* ECF No. 21-5 (CBS Corporate Policy Guide) at 18–19. The same policy also states that "a written warning is not required for discharge of an employee" if termination is due to dishonesty or conduct "which is

---

[12]     CBS disputes that Godwin told Baskerville that she had a clean slate, and Godwin testified that she didn't think she would use those words. *See* Def. Reply at 10 (citing Godwin Dep. at 83:20–84:15, 116:20–117:22).

adverse to the safety and welfare of CBS or its employees." *Id.*  Because Baskerville was terminated based, in part, on her handling of the June 8 intern incident, which was conduct "adverse to the safety and welfare of [CBS] employees," *i.e.*, the two interns involved in the incident, there is no evidence that CBS's articulated reasons contravened company policy and therefore were pretextual.  *See Brady*, 520 F.3d at 494.

Lastly, Baskerville argues that Godwin lacked credibility when she denied knowledge of Baskerville's medical issues and when she testified that Baskerville was dishonest about her handling of the intern incident.  *See* Pl. Opp. at 37.  These factual disputes about Godwin's testimony are immaterial and do not provide a sufficient basis for a reasonable jury to find that CBS's reasons for terminating Baskerville were pretextual.  *See Giles*, 794 F.3d at 6.  Even assuming that Godwin knew about Baskerville's PMDD and did not really believe that Baskerville was dishonest, those facts would not support a conclusion that CBS's asserted non-discriminatory reasons were not its actual reasons.  As discussed, *supra*, Baskerville's poor job performance and her lack of judgment in sending a second intern to handle the medical emergency were legitimate reasons to terminate her.  Neither of those reasons is undermined by Godwin's alleged lack of credibility with respect to unrelated issues.  This is particularly true because Baskerville does not question Godwin's credibility concerning a far more important fact — her stated reasons for Baskerville's termination.  *See* DSUMF, ¶ 84 ("I believe she was being honest with me."); DSUMF, ¶ 85 ("[E]verything that [Godwin] said to me[,] she meant."); PSMFD at 54–55 (failing to dispute either statement).

\*     \*     \*

In sum, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Tex.*

*Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). "[T]o survive summary

judgment[,] the plaintiff must show that a reasonable jury could conclude from all of the

evidence that the adverse employment decision was made for a discriminatory reason." *Lathram*

*v. Snow,* 336 F.3d 1085, 1088 (D.C. Cir. 2003). A reasonable jury could not so conclude here.

Accordingly, the Court will grant CBS's Motion for Summary Judgment as to Baskerville's

DCHRA claim.

## II.    Retaliation Under DCFMLA

Baskerville also alleges that CBS terminated her employment in retaliation for her taking

thirteen weeks of medical leave under the DCFMLA. *See* Compl., ¶¶ 48–54; Pl. Opp. 26–30.

Under certain circumstances, the DCFMLA entitles an employee to take temporary medical

leave from employment, with protection from the termination of her job. *See* D.C. Code § 32–

503(a) ("[A]ny employee who becomes unable to perform the functions of the employee's

position because of a serious health condition shall be entitled to medical leave for as long as the

employee is unable to perform the functions."); *id.*, § 32-507(a) ("It shall be unlawful for any

person to interfere with, restrain, or deny the exercise of or the attempt to exercise any right

provided by [the DCFMLA].").

Retaliation claims under the DCFMLA proceed under the traditional *McDonnell*

*Douglas* framework that also applies to the DCHRA:  The plaintiff bears the initial burden of

establishing a prima facie case of discrimination; if she does, then the employer must articulate a

legitimate, non-discriminatory reason for its action; and the plaintiff then has a final opportunity

to show that the employer's reason was a pretextual cover for discrimination. *McDonnell*

*Douglas,* 411 U.S. at 802; *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 161 (D.C. Cir. 2015).

To make a prima facie case of retaliatory termination under the DCFMLA, a plaintiff must show

that: (1) she engaged in protected activity, (2) her employer subjected her to an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse action. *Chang*, 846 A.2d at 327.

The parties agree that Baskerville engaged in protected activity when she took her medical leave and that her termination constitutes an adverse employment action. *See* Def. Mot. at 17–19; *see also Chang*, 846 A.2d at 329 ("[T]aking FMLA leave constitutes a 'protected activity,' [and] termination constitutes an 'adverse employment decision.'" (citation omitted)). CBS argues, however, that Baskerville's retaliation claim "fails because she cannot point to any evidence to show that her medical leave was the 'but-for' cause of her termination." *See* Def. Mot. at 17 (cleaned up); *see Gonda v. Donahoe*, 79 F. Supp. 3d 284, 301 (D.D.C. 2015) ("[R]etaliation claims must be proved according to traditional principles of but-for causation." (citation omitted)). Under the but-for standard, it is not sufficient for Baskerville to demonstrate that a reasonable jury could find that retaliatory animus by CBS was *a* cause for her termination. *See Gonda*, 79 F. Supp. 3d at 301. Rather, Baskerville must demonstrate that there is a genuine issue of material fact as to whether retaliatory animus was *the* cause for her termination. *See Rattigan v. Holder,* 982 F. Supp. 2d 69, 81 (D.D.C. 2013). In other words, Baskerville must proffer evidence that she would not have been terminated if she had not taken medical leave.

Baskerville's only evidence that her FMLA leave was the cause of her termination is the temporal proximity of those events. *See* Pl. Opp. at 27–28; Compl., ¶ 52.[13] According to Baskerville, her termination two months after her medical leave "sufficiently show[s] a causal connection." *See* Pl. Opp. at 27. But once a defendant proffers a legitimate reason for the adverse employment action, temporal proximity standing alone is not sufficient to "defeat the

---

[13] Indeed, Baskerville admits in her deposition: "I don't have any proof of [retaliation] per se, except for — no, I'm trying to think if I even have any proof of it and I can't think of it right now." *See* DSUMF, ¶ 90.

proffer and [to] support a finding of retaliation." *Woodruff*, 482 F.3d at 530; *see also Miles*, 653 F. App'x at 9 ("Temporal proximity, standing alone, cannot rebut an employer's legitimate, non-discriminatory reason for an adverse employment action.").

As discussed, *supra*, CBS has asserted legitimate, non-discriminatory reasons for Baskerville's termination — her record of poor job performance and her mishandling of the June 8 intern incident.  Neither of those reasons is related to her taking of medical leave, and the intern incident was an intervening event that refutes any inference of retaliation that can be drawn by temporal proximity.  *See Fields v. Office of Johnson,* 520 F. Supp. 2d 101, 106 (D.D.C. 2007) (citing *Paquin v. Fed. Nat'l Mortgage Assoc.*, 119 F.3d 23, 32 (D.C. Cir. 1997)) (explaining that temporal proximity as a basis for an inference of causation can be refuted if there was "an intervening event that completely explain[ed] the decision to fire [the employee]").  Rather than showing "an unbroken connection" between the medical leave and Baskerville's termination, the record reflects a "new and independent" basis on which CBS reasonably terminated Baskerville's employment.  *See Buie v. Berrien*, 85 F. Supp. 3d 161, 179 (D.D.C. 2015) (quoting *Breeden v. Novartis Pharm. Corp.,* 646 F.3d 43, 53 (D.C. Cir. 2011)).  Baskerville cannot escape the fact that she was terminated almost immediately after she mishandled the intern incident.  Under such circumstances, and with no evidence of retaliation other than the timing of her medical leave, Baskerville fails to present a triable issue of fact with respect to her retaliation claim.  *Minter v. District of Columbia*, 809 F.3d 66, 71–72 ("[W]hen an employer comes forward with [] legitimate, nonretaliatory reason[s] for an employment action, 'positive evidence beyond mere proximity' is required 'to create a genuine issue of material fact concerning whether the motive for [an adverse employment action] was . . . retaliation.'")

(quoting *Solomon v. Vilsack*, 763 F.3d 1, 16 (D.C. Cir. 2014)).  The Court therefore will grant CBS's Motion for Summary Judgment with respect to that claim.

## CONCLUSION

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment on all counts.  A separate Order will issue this day.


_____
FLORENCE Y. PAN
United States District Judge


Date:   March 2, 2022